Warren Nemiroff, Esq.  SBN 62262
LAW OFFICES OF WARREN NEMIROFF
9595 Wilshire Blvd., Suite 900
Beverly Hills, California  90212
Tel (310) 285-1559 ♦ Fax (310) 492-4394

Gregory Grantham, Esq. SBN 125732
610 Newport Center Drive, Suite 600
Newport Beach, CA  92660
Tel (949) 720-0806 ♦ Fax (949) 720-0808

Attorneys for Plaintiff, COBALIS CORP., a Nevada corporation

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

| In re **COBALIS CORP.,** Debtor-in-Possession. | Case No. 8:07:12347-TA Chapter 11 |
|---|---|
| **COBALIS CORP., a Nevada corporation,** Plaintiff, vs. **YA GLOBAL INVESTMENTS, L.P., a Delaware limited partnership, formerly known as CORNELL CAPITAL PARTNERS, LP; and YORKVILLE ADVISORS, LLC, a Delaware limited liability company,** Defendants. | Adversary No.  08-09-AP-01705-TA **THIRD AMENDED COMPLAINT FOR:** 1. Breach of Securities Purchase Agreement 2. Breach of Debenture Agreement 3. Violation of Rule 10-b-5 4. Violation of Section 17(a)(1) of the Exchange Act 5. Violation of 18 U.S.C. § 1961(a) – [R.I.C.O.] 6. Unjust Enrichment & Restitution 7. Declaratory & Injunctive Relief 8. Unfair Business Practices 9. Intentional Interference with Prospective Economic Relations 10. Breach of Fiduciary Duty DEMAND FOR JURY TRIAL |

Plaintiff, COBALIS CORP., a Nevada corporation, ("Cobalis") a reorganized debtor, hereby respectfully complains and alleges as follows:

I.

**STATEMENT OF JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157 in that this action arises in or relates to the bankruptcy of Cobalis Corp., Case No. 8:07-12347-TA which was commenced by the filing of an involuntary Chapter 7 petition on August 1, 2007, by defendant, YA Global Investments, L. P. ("YA Global") f/k/a Cornell Capital Partners, L P ("Cornell").

2.      Plaintiff, as the Debtor-in-Possession has standing to bring this action pursuant to 11 U.S.C. § 1107.

3.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1409 as this adversary proceeding arises under Title 11 or relates to a case under Title 11 which is pending in the Central District of California and does not involve a consumer debt.

4.      On January 28, 2008, Defendant, YA Global Investments, L.P., formerly doing business as Cornell Capital Partners, L.P., filed a proof of claim in this case in the amount of $3,000,000 (Claim No. 6) secured by an alleged first priority lien on substantially all of the Debtor's assets, and subsequently amended its proof of claim on July 28, 2010, claiming $1,500,000 as a secured claim, with an alleged first lien position on substantially all of the debtor's assets, and an unsecured claim of not less than $3,959,000. Claim No. 6 was thereafter amended a second time by YA Global Investments, L.P., on  September 29, 2010, in which they claimed $1,500,000 as a secured claim, and $2,820,000 as an unsecured claim, with an additional $1,000,000 estimated contingent claim.

5.      This action is a core proceeding under 28 U.S.C. § 157(b) (2) (A), (B), (C), (K) and (O).   To the extent any claim for relief contained herein is determined not to be a core proceeding, Plaintiff consents to entry of final judgment and orders by the Bankruptcy Court.

**II.**

**PARTIES**

6.      Plaintiff, Cobalis Corp., ("Cobalis") is corporation duly formed and organized under the laws of the State of Nevada and qualified to transact business in the State of California.

7.      Defendant, YA Global Investments, L.P. ("YAGI") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal office in the State of New Jersey, and at all relevant times mentioned herein was conducting business in the State of California.  YAGI is the successor in interest to Cornell Capital Partners, LP ("Cornell") a/k/a YA1, a/k/a YA2 (funds).

8.      Defendant, Yorkville Advisors, LLC ("Yorkville"), f/k/a Yorkville Management, LLC, is a limited liability company organized and existing under the laws of the State of Delaware.  Yorkville is the general partner of Yorkville Advisors Global Investors (YAGI).  YAGI is currently domiciled in the Cayman Islands and is at this time an unregistered fund in the United States of America.

9.      Plaintiff is informed and believes and based thereon alleges that at all times mentioned herein each of the Defendants was and now is the agent, servant, employee, co-conspirator, representative and alter ego of each of the remaining defendants and, in doing the things hereinafter alleged was acting within the scope of his or its  authority as such agent, servant, employee, co-conspirator, representative and alter ego, with the knowledge, permission, consent and ratification of the remaining defendants.

**III.**

3

**GENERAL ALLEGATIONS**

A.     **Cobalis & its Patented Pharmaceutical Product: PreHistin®**

10.     Plaintiff is a specialty pharmaceutical company that has been focused on the development of PreHistin®, a patented, over-the-counter dietary supplement product intended to treat seasonal and year-round allergy sufferers.  Plaintiff intends to market its product over-the-counter in major drugstore chains and other outlets worldwide.  PreHistin® is intended to become the first medication aimed specifically at rectifying imbalances in the immune system that trigger the over-production of allergy symptom-causing substances, including histamine.  By preventing or reducing the over-production of histamine before it is released, Cobalis believes PreHistin® represents a novel and compelling alternative to the standard "antihistamine" approach to treating allergic disease .  PreHistin® is a sublingual, (under the tongue), lozenge containing 3.3 mg of cyanocobalamin and methylcobalamin that is absorbed through the buccal membrane, allowing direct introduction of the active ingredient into the bloodstream. In this manner, Plaintiff believes that PreHistin® is distinguished from orally-ingested cobalamins which first pass through the digestive tract before the active ingredient is systemically available.  The active ingredient in PreHistin® has been shown to reduce nasal symptoms without the drowsy, sedating side-effects associated with many other allergy medications.

11.     As an easy-to-use sublingual lozenge, Cobalis believes that PreHistin® provides a patient-friendly alternative to unpleasant injections as well as to powerful antihistamines that can often cause unwanted drowsiness and other uncomfortable effects.  Cobalis has formulated the PreHistin® lozenge to be dissolved under the tongue and swallowed twice daily prior to the beginning of the allergy season or daily for year-round allergy sufferers.

B.     **Structured PIPE Transaction with Cornell**

12.     YAGI, formerly known as Cornell, holds itself out to the public as an investment consulting firm and is one of the more active hedge funds in PIPE transactions that arranges

financing for public companies using a technique known as Private Investment in Public Equities ("PIPE").  PIPE transactions are authorized under Rule 152 under the Securities Act of 1933, as amended, which provides a safe harbor to the issuer, a publicly traded company, completing a private placement offering and subsequently registering the securities for resale to the public.  A traditional PIPE is a purchase of stock in a company at a discount to the current market value per share for the purpose of raising capital.  In a traditional PIPE, the stock is issued by a publicly traded company at a set price to raise capital for the issuer.   In a "structured" PIPE, the first step is private placement of debt securities or debentures that are convertible into common stock at a conversion price that automatically adjusts downward if the company's share price falls. These structured PIPEs have been colloquially dubbed "toxic" or "death-spiral" convertibles because the purchaser of PIPE convertible debentures has a strong incentive for short selling to lock in the sale price of the company's stock. The short position may be covered by converting shares in the debentures. This selling creates downward pressure on the issuer's stock, which benefits the debenture holder by allowing it to obtain more shares through conversion shares at depressed prices. Indeed, there is no limit on the downward adjustment of the conversion price.  The prospect of large-scale conversions and sales at declining prices can create selling pressure which pushes the issuer's share price downward. Structured PIPE debenture purchasers are ambivalent towards the performance of the company because they can reap substantial gains as the stock spirals downward. Hedge funds are able to obtain market-beating returns notwithstanding the poor performance of PIPE issuers through a relatively straightforward trading strategy. They sell short the issuer's common stock promptly after the PIPE deal is publicly disclosed. To execute a short sale, a fund borrows stock of the PIPE issuer from a broker–dealer and sells this borrowed stock into the market. The fund then closes out or covers the short sale at a later date by buying shares in the open market and delivering them to the lender. By shorting stock against the PIPE shares, the fund locks in the PIPE deal purchase discount.

13.     On or about December 20, 2006, Plaintiff entered into a structured PIPE transaction with Cornell, pursuant to which Plaintiff agreed to issue Cornell secured convertible debentures in a private placement offering, followed by a registration of the common stock. Cornell could convert its debentures based on a 10% discount from the 3 lowest volume-weighted average share price (VWAP) over a 15 day look-back period of time preceding the conversion.  Counsel selected by Cornell prepared the various agreements comprising the structured PIPE transaction.  A true and correct copy of each such document comprising the PIPE Transaction is listed below:

- SECURITIES PURCHASE AGREEMENT        (Exhibit "1")
- SECURED CONVERTIBLE DEBENTURE        (Exhibit "2")
- REGISTRATION RIGHTS AGREEMENT        (Exhibit "3")
- SECURITY AGREEMENT                   (Exhibit "4")
- ASSET PLEDGE STATEMENT               (Exhibit "5")
- PLEDGE AND ESCROW AGREEMENT          (Exhibit "6")
- IRREVOCABLE TRANSFER AGENT INST.     (Exhibit "7")
- LOCK UP AGREEMENT                    (Exhibit "8")
- WARRANT NO. CLSC-1-A                 (Exhibit "9")
- WARRANT NO. CLSC-1-B                 (Exhibit "10")
- WARRANT NO. CLSC-1-C                 (Exhibit "11")
- WARRANT NO. CLSC-1-D                 (Exhibit "12")

A true and correct copy of each of the above listed documents is attached to this pleading, identified by the exhibit number opposite the name of each document named above.

14.     The structure of the PIPE conversion provided a built-in incentive to Cornell to short Plaintiff's stock because the number of shares of common stock which Cornell could exchange for debentures increased proportionately with a decrease in the price of Plaintiff's common stock.  Plaintiff's common stock was a thinly traded over the counter bulletin board stock, (OTCBB), in which bid and ask prices were set by brokerage firms acting as market makers. The average  number of shares of Plaintiff's stock traded each day was in the tens of thousands whereas Cornell and YAGI, (hereinafter, unless specifically differentiated,  use of the word 'Cornell' shall refer collectively to Cornell and its successor,  YAGI, and vice versa), was

1    entitled to convert debentures and exercise warrants collectively totaling in excess of ten

2    million. Cornell insisted upon, and obtained, a reserve of 15,400,000 shares held in escrow,

3    which later could be increased under the Convertible Debentures and Warrants, as set forth in

4    the Pledge and Escrow Agreement, and Irrevocable Transfer Agent Instructions.   At the time of

5    the PIPE transaction on December 20, 2006, Plaintiff had issued approximately 36,000,000

6    shares of common stock, of which 8,400,000 shares were owned by the Radovich family, and

7    were pledged to YAGI as additional collateral for the Debentures.  The Radovich family was

8    holding the stock long-term, and had just converted $5,200,000 in debt owed by Cobalis to the

9    Radovich family for just under 4,000,000 shares.  As insiders, no Radovich family controlled

10    shares were sold in the open market.  Cornell insisted upon, and obtained, a 'lock up'

11    agreement for the insider's shares, as well as received an Asset Pledge Agreement for the

12    insider's shares as additional collateral, which further provided it with effective 'control' over a

13    dominant and controlling block of Plaintiff's common stock.  Cornell had the power and

14    incentive should it so choose to  exercise it, to create  significant downward selling pressure on

15    Plaintiff's common stock sufficient to cause a continued downward  price movement,

16    sometimes referred to by professional commentators on structured PIPE  financings as 'the

17    death spiral'.   Plaintiff was aware of Cornell's power and potential control over its share price

18    through concentrated trading activity and sought to *curb it*, through contractual provisions,

19    which prohibited Cornell from engaging in short sales.   The intent of the parties in using the

20    term "short sales" was to refer to a practice of selling a security without possession of a

21    physical certificate bearing a serial number.  The parties were aware of SEC regulation SHO

22    which has an exception for sales that would otherwise be short sales.  The exception applies to

23    sellers who own debentures that can be converted into share certificates with serial numbers.

24    The parties deliberately chose not to refer to regulation SHO because it was their intent that

25    Defendants could not sell Cobalis shares unless and until share certificates bearing serial

26    numbers were in their hands.  To further limit downward selling pressure on Plaintiff's stock,

27    Plaintiff insisted on limiting  Cornell's ownership to no more than 4.99% of Plaintiff's issued

28

1  shares at any one point in time, and obligated Cornell to hold its block of Plaintiff's common

2  stock  accumulated under the PIPE Transaction as an investment, with an investment purpose,

3  and not as a trader attempting to benefit from short term swings in price caused by or

4  contributed to by concentrated trading activities of Cornell in a short period of time.  This

5  investment purpose provision was clarified and supplemented by communications between

6  Plaintiff's executive, Chas Radovich, and officers of Cornell, David Andresen and Craig Engler,

7  that in the event Cornell sought to exit its position in Plaintiff's stock, it would do so in an

8  orderly manner, at a rate of no more than 10 – 20% of the weekly trading volume, or roughly

9  10,000 – 25,000 shares per week.

10        15.     The  Debentures were convertible into shares of Plaintiff's common stock

11  determined by dividing the dollar amount being converted **by the lower of** the fixed

12  conversion price of $0.**99 or the market conversion price, defined as 90% of the average of**

13  **the lowest three daily volume weighted average trading prices per share of the Company's**

14  **common stock for the fifteen trading days immediately preceding the conversion date**.

15        16.      The convertible Debentures were to be secured by the assets of the Company

16  pursuant to the terms of the Security Agreement. (Ex. "4 "). The Security Agreement and other

17  transaction documents required Cornell to perfect its security interest through a UCC-1 filing

18  and for Plaintiff to lend its cooperation, if necessary.  The Security Agreement and all other

19  Transaction Documents were said therein to be governed by  New Jersey law.

20        17.     The convertible debentures were further secured by an Asset Pledge Agreement

21  by 8,400,000 shares of the Radovich family common stock with recourse. (Ex. "5").  The

22  Radovich family shares so pledged are being held at YAGI's offices in New Jersey, and the

23  appointed escrow agent is David Gonzalez, Esq., who is also YAGI's chief legal counsel.

24        18.      In order to insure:  (1) Cornell  would be able to promptly take delivery of share

25  certificates after a notice of conversion; and (2) Plaintiff would have sufficient quantities of

26  shares available to issue to Cornell after a  notice of conversion, and collectively so as to

27  eliminate any risk to Cornell that Plaintiff or its transfer agent would delay delivery,  Plaintiff

28

agreed to grant Cornell the right to control issuance and delivery of all shares convertible under the securities purchase agreement, debentures, and warrants. This right of control was set forth in the  Pledge and Escrow Agreement, pursuant to which Plaintiff was required to reserve  10,583,000 shares of common stock, later increased to 15,400,000 shares,  and granted control over such shares to  David Gonzalez, Esq.,  Cornell's attorney, as the appointed escrow agent.  (Ex. "6")  Cornell's control over issuance and delivery of the shares was solidified by Irrevocable Instructions to the stock transfer agent executed by Plaintiff by which Cornell was granted the right to compel the stock transfer agent to issue share certificates to Cornell after receipt of a Notice of Exercise of Conversion (Ex. "7").

19.    Defendant YAGI's potential control over the stock of Plaintiff was increased by four classes of warrants issued to Cornell enabling it to purchase, at its discretion, up to 6,640,602 shares of common stock at pre-set market prices between $0.72 and $0.9955. (Exs. 9, 10, 11, 12).  The desire of  Defendants to own these warrants further convinced Plaintiff that the interest of Defendants and Plaintiff in the long-term future of Cobalis were in sync.

20.    Plaintiff is informed and believes and based thereon alleges that Defendants, including their respective affiliates or brokers acting on behalf of defendants or at their instance and request, accumulated the following shares of Plaintiff's common stock through conversions, with such accumulation being primarily for purposes of covering short sales of Plaintiff's such shares of common stock made in advance of receipt of certificate from conversion:

| Date | Certificate # | $ Amount | # of Shares | Price Per Share |
|------|---------------|----------|-------------|-----------------|
| 3/23/07 | 9448 | $25,000 | 33,025 | $0.76 |
| 4/10/07 | 9466 | 25,000 | 36,539 | 0.68 |
| 4/12/07 | 9467 | 500,000 | 730,780 | 0.68 |
| 4/24/07 | 9499 | 999,999 | 1,333,333 | 0.75 |
| 7/13/07 | 9544 | 170,000 | 1,524,664 | 0.11 |
| 7/19/07 | | 195,000 | 1,748,879 | 0.11 |

| | | | | |
|---|---|---|---|---|
| 9/27/07 | | 79,809 | 1,505,823 | 0.05 |
| 9/28/07 | | 32,191 | 607,385 | 0.05 |
| 10/16/07 | 9587 | 67,000 | 1,607,143 | 0.04 |
| 1/28/08 | | 13,200 | 498,113 | 0.0265 |
| 3/12/08 | 9635 | 52,500 | 2,375,566 | 0.02 |
| 4/3/08 | 9637 | 60,000 | 2,343,750 | 0.03 |
| 4/18/08 | 9641 | 22,049 | 1,055,000 | 0.02 |
| **TOTAL** | | **$2,241,748** | **15,400,000** | **0.1455** |

21.    Plaintiff's stock price at the end of each of the following months, with the total monthly trading volume during said month in set out hereinbelow:

| Month | Close | Trading Volume |
|---|---|---|
| December 2006 | $0.71 | 407,400 |
| January 2007 | 0.74 | 565,100 |
| February 2007 | 1.02 | 1,235,900 |
| March 2007 | 0.80 | 924,000 |
| April 2007 | 1.18 | 3,382,900 |
| May 2007 | 0.72 | 3,712,700 |
| June 2007 | 0.35 | 2,147,600 |
| July 2007 | 0.16 | 8,919,800 |

As demonstrated by the above table, prior to the PIPE transaction with Defendants, Plaintiff's share price ranged between approximately $0.70 -- $1.10, and trading volume was approximately 100,000 to 125,000 shares each week. After the structured PIPE transaction with Defendants, when the registered shares became 'free trading' and available to Cornell to convert or cover their short sales, trading volume rapidly increased to approximately 750,000 to 1,000,000 share per week. Because of Cornell's heavily concentrated selling activity in the market – all shares converted or acquired under warrants were sold promptly – there was a

1  constant downward pressure on the stock price which caused the share price to decrease until

2  less than 10¢ a share in late July, 2007, and fall to a penny after Cornell filed an involuntary

3  bankruptcy petition against Plaintiff on August 1, 2007.   The rapid increase in the trading

4  volume and dramatic decrease in share price was mainly due to Cornell's steady and heavy

5  short selling and sales of shares acquired through exercise of the  convertible debentures and

6  warrants  in the PIPE transaction, in violation of contractual provisions and covenants

7  prohibiting short sales,  hedging operations, and accumulation of shares above a threshold of

8  4.99% of the outstanding stock, (equal to approximately 2,245,000 shares at any point in time),

9  and holding shares with an investment purpose . [Note: Plaintiff is informed and believes that

10  some of the reported trading volume in July, 2007 was double counted 'sales' inasmuch as

11  Cornell was selling short and its brokers, Ridge Clearing and or Knight Trading, were acting as a

12  principal, as a buyer, and selling thereafter as market orders came in, as a middleman, with any

13  short positions by the brokers covered by Cornell delivering shares converted from

14  debentures.  On one occasion, Cornell caused a share certificate issued on a conversion to be

15  issued and delivered directly to Ridge (the clearing house) to cover its short position and close

16  out the trade, instead of Cornell, the holder of the convertible debenture.

17

18  **FIRST CLAIM FOR RELIEF**

19  **(Breach of Securities Purchase Agreement)**

20

21        22**.**        Plaintiff re-alleges and incorporates by this reference each and every allegation

22  of paragraphs 1 through 21 inclusive, set forth above.

23        23.        On or about December 20, 2006, Plaintiff entered into a Securities Purchase

24  Agreement with Cornell, a true and correct copy of which is attached hereto, marked Exhibit

25  "1" and incorporated by this reference.   The Securities Purchase Agreement provides at

26  paragraph 4(l):

27

28

Neither the Buyer(s) nor any of its affiliates have an open short position in the Common Stock of the Company, and the **Buyer(s) agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales of or hedging transactions** with respect to the Common Stock as long as any Convertible Debentures shall remain outstanding.

24.    The above quoted provision of the Securities Purchase Agreement prohibited Cornell and its affiliates, (including but not limited to Cornell, YAGI, and Yorkville, as well as Ridge Clearing, Blue Trading, Sloan Securities and Knight Securities), from engaging in "any short sales of or hedging transactions with respect to the Common Stock" of Plaintiff. This provision was intended to mean, and means, that Cornell and its affiliates are prohibited from selling shares unless they owned the certificates, bearing serial numbers, and had physical possession of same at the time of sale. The shares held in escrow reserved for future issuance were not 'owned' shares and held in Cornell's account; they had no serial numbers. The shares reserved and held in escrow under the Pledge and Escrow Agreement, which did have serial numbers, were for contingent future delivery to Defendant.   The shares with no serial numbers would not be 'owned' shares and 'in Defendants' accounts', until they were actually converted, issued, delivered and received in Defendants' accounts, and made free-trading through registration or under Rule 144. In other words, Defendants were prohibited from selling more shares than the sum of the certificates, with serial numbers, that they had in their account at the time of sale and were prohibited from selling any part of the 15,400,000 plus shares in the escrow account until the debentures had actually been converted, shares issued, sent for delivery and received in Defendants' account as free-trading and not restricted. At that point, sales of Plaintiff's stock by Defendants would be sold 'long' and not 'short'.

25.    In addition, under the "hedging operations" prohibition in the above quoted provision of the Securities Purchase Agreement, Cornell is further prohibited from entering into any agreements for the sale of Plaintiff's stock, involving future delivery of share certificates after settlement date. That the foregoing is the meaning and was the intended meaning of the term, "shall not . . . . engage in any short sales of or hedging transactions with

12

respect to the Common Stock" will be established and clarified at the time of trial by reference to, inter alia, the following:

- o Plaintiff's President, Chas Radovich, sought and obtained clarification of this term from Cornell's officers, Craig Engler and David Andresen, before the Securities Purchase Agreement was executed, both of whom stated it meant that Cornell would not sell Plaintiff's stock short before conversion of the debentures and physical receipt of free-trading share certificates in account, and further stated that Cornell's intention was to hold shares consistent with the paragraph 2(a) of the Securities Purchase Agreement which states Cornell intended to acquire shares for investment purposes and not for immediate sale to the public, but rather would seeking appreciation and capital gains through the growth of the company. When queried further by Mr. Radovich as how Cornell would exit their position as shareholders when holding a significant position in the stock, they stated that Cornell would never sell at a rate more than 10-20% of the average daily trading volume of the stock, so as not to create downward pressure on the market price. Further, Cornell's senior vice president and manager, Craig Engler and David Andresen, stated numerous times that they would not "hit the bid", offer the stock "on the ask" and never exceed 10% - 20% maximum of the daily volume. In practical numbers, this meant that Cornell would not sell more than 10,000 – 25,000 shares per week.

- o While the parties were well aware of the terms about to be referenced, they intended that these words should have their common meaning rather than an arcane term of art used in securities regulations. The parties were acting in good faith and neither believed that the other would engage in violations of the securities laws. The parties *intentionally* did not define the terms 'short sales',

'open short sales' or 'hedging operations' by reference to  Regulation SHO under the Securities Exchange Act of 1934 and or other rule, regulation or statute. That this omission was intentional is shown by the fact that elsewhere in their agreements the parties specifically referred to rules of the Securities and Exchange Commission to supply the definition of a particular term, (e.g., 'beneficial ownership' is defined by reference to a statute, Secured Convertible Debenture, Section 4(b)(1)). The language chosen by the parties was intended to prohibit *all* forms of shorts sales and hedging operations, (naked and covered shorts). The parties omitted any reference to Regulation SHO because such regulation contains an exception for shares issued to the holder of a convertible debenture. This exemption was designed to protect the holder of convertible debentures against delays in issuance beyond its control after a notice of exercise caused either the issuer or stock transfer agent  failing to promptly respond to notices of exercise of conversion rights, failing to promptly prepare share certificates, remove legends from shares, and send the shares for delivery. Instead, the language chosen by the parties was intended to prohibit in the broadest sense, all short sales and hedging operations.  The parties did so for two reasons: (a) Cornell would always be potentially 'covered' for sales in the market under the conversion feature in its debentures and thus reference to Regulation SHO would create a loophole that would swallow, and render completely meaningless,  the anti shoring provision agreed upon by the parties; and (b) Cornell had eliminated any risk of delay that Regulation SHO sought to protect the holder of a convertible debenture against, in that Cornell had insisted upon, and Plaintiff consented to, creating a 15,400,000 share reserve held in an escrow account controlled by Cornell's attorney, David Gonzalez, Esq. who was also given Irrevocable Instructions by Plaintiff to its Stock Transfer Agent to accept Mr. Gonzalez's direction concerning issuance of shares in the

reserve. Said reserve created a pool of shares available for prompt issuance to Cornell upon notice of exercise of conversion. Plaintiff's execution of Irrevocable Instructions to the stock transfer agent, to the effect that it was to accept and immediately act upon the instructions of Mr. Gonzalez with respect to issuance of shares to Cornell under the Securities Purchase Agreement, (an extraordinary concession), granted control to Cornell over issuance and delivery of the reserved shares -- up to 15,400,000 of Plaintiff's common stock. Defendants could demand and control prompt, if not immediate, issuance of share certificates in connection with a conversion notice.  No point would be served in applying the exception in Regulation SHO for convertible debentures when, as here, the holder of the debentures controlled the issuance of the share certificates.   As a result of these extraordinary circumstances, Plaintiff and Cornell agreed to a common law definition of ''short sales', and 'hedging operations', (applied by reference to the common law of New Jersey in their agreements), which meant any sale of stock where the seller does not have the shares in its account at the time of sale was a short sale.  Hedging operations is a term broader in scope and more all encompassing than 'short sales'.   It commonly refers to an agreement for the purchase or sale of stock at a fixed price with the delivery or closing of the transaction to take place at some later point in time, or upon the occurrence of certain conditions.  Since Cornell controlled the process of issuance of shares under the convertible debentures and warrants, and also controlled delivery of share certificates, bearing serial numbers, any delay in delivery of share certificates to its account was its sole responsibility.  Therefore gaps in time between sales of stock on the market and delivery of share certificates to the broker or clearing house handling the trade would be intentional.  Such sales in the open market before delivery of shares into Cornell's account could only serve an ulterior purpose of Cornel in creating

downward pressure on the movement of Plaintiff's stock price, thus creating a more favorable conversion rate to Cornell, or lowering the amount of the convertible debenture reduced by the conversion.

.    26.    Defendants have materially breached the Securities Purchase Agreement by engaging in short sales and hedging operations.  In particular, in April, 2007 and July, 2007, and through October, 2007, Defendants sold shares of Plaintiff's common stock, by and through its brokerage firms, Sloan Securities Corp., Ridge Clearing, and others, when Defendant did not have free-trading share certificates, with serial numbers, in its account to cover the number of shares sold.    Defendant  later 'covered' its short sales by converting debentures into share certificates with serial numbers; however, at all relevant times the Defendants were   in complete control of this process -- issuance and delivery of share certificates --  under their agreements with Plaintiff, in particular the Pledge and Escrow Agreement,   and Irrevocable Instructions to Transfer Agent. Consequently, any alleged delay in covering the short sales was entirely the fault of Defendants and not attributable to the actions of Plaintiff or its stock transfer agent.

27.    Because Cornell Capital could time the conversions of debenture principal in Plaintiff's common stock at 90% of the average of the three lowest daily weighted-average prices over the past 15 days, the conversion pricing structure virtually guaranteed that Cornell could lock in gains if it breached the agreement and sold shares short through a dealer or dealers trading on a principal basis in advance of conversions and then sell those shares to the dealers through closing tickets soon after the conversions into common shares had been effected.  In July 2007, heavy short selling by dealers occurred in advance of the large block sales by Cornell. On July 12, 2007, Cornell sold short 1,774,644 shares before the associated share certificate, with serial number had been issued and well before the shares actually were received in Cornell's trading account at Sloan Securities. (While this procedure 'may' have been in conformity with Regulation SHO, it was a breach of the parties' agreement.) Those shares

were sold for $0.22 per share prior to discount and $0.2084 per share as part of a closing ticket selling 1,774,644 shares on July 12, 2007. Given the volatility of Cobalis' share price, particularly after the price was depressed between July 6 and 11, 2007 (in large part in association with large block sales by Cornell Capital), **the only way such a large block of shares could have been brokered or sold at a relatively high market price on July 12, 2007, relative to the lower market prices in the prior week and in the subsequent week was if the dealer had been selling short on Cornell Capital's behalf for some extended period of time beginning well prior to July 2007.** In particular, Knight Trading was actively shorting the common shares of Plaintiff as a principal in June and July prior to purchasing 1,774,644 common shares of Plaintiff's stock to cover its short position toward the end of trading on July 12, 2007. That 1,774,644 purchase of Plaintiff's common shares by Knight Trading exactly matches the accrued short sales by Cornell of Plaintiff's common shares on that day.

28.    Similarly, in addition to the short sale on July 12, 2007, Cornell sold shares short in April, 2007, before those shares were received into its account, on April 12, 13 and 17. Attached hereto, marked **Exhibit "13"** and incorporated by this reference is a table showing the shares in Plaintiff's account, trading volume and sales of Plaintiff's shares by Defendants' shares, each trading day from March 1, 2007 through November 5, 2007. **This table reflects that Defendants had sold more shares than the number of shares it had in its account on April 12, 13, and 17, 2007 and on July 12, 2007. The short position established on July 12, 2007 was not covered until July 23, 2007 – a 'short position' under any terminology or definition of short, (even the T + 3 rule of Regulation SHO).** The trade records for Plaintiff's stock, maintained by the OTCBB exchange, reveals significant short selling by dealers in trades in April and July 2007 consistent with the heavy block trading sell orders of Cornell.

29.    Plaintiff has performed all of the material conditions, covenants and promises required by it to be performed in accordance with the terms of its agreements with Defendants.

17

30.    As a direct result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**(Breach of Debenture Agreement)**

31**.**    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 30 inclusive, with the exception of paragraph 22, set forth above.

32.    On or about December 20, 2006, Plaintiff entered into a Convertible Secured Debenture Agreement with Cornell, a true and correct copy of which is attached hereto, marked Exhibit "2" and incorporated by this reference.  The Secured Convertible Debenture provides at Section 4(a)(i) provides that: "This Debenture shall be convertible into shares of Common Stock at the option of the Holder, in whole or in part at any time and from time to time, after the Original Issue Date (as defined in Section 6) *(subject to the limitations on conversion set forth in Section 4(b) hereof).*    Paragraph 4(b), governing "*Certain Conversion Restrictions*", provides in relevant part, the following restriction:

> (i)    The Company shall not effect any conversions of this Debenture
> and the Holder shall not have the right to convert any portion of this Debenture
> or receive shares of Common Stock as payment of interest hereunder to the
> extent that after giving effect to such conversion or receipt of such interest
> payment, the Holder, together with any affiliate thereof, would beneficially own
> (as determined in accordance with Section 13(d) of the Exchange Act and the
> rules promulgated thereunder) in excess of 4.99% of the number of shares of
> Common Stock outstanding immediately after giving effect to such conversion
> or receipt of shares as payment of interest.

33.     On or about December 20, 2006, at the time Plaintiff and Defendants entered into the structured PIPE transaction documents, Plaintiff had approximately 36,000,000 shares of common stock outstanding.  By July 29, 2007, mainly as a result of Defendants conversion of debentures into common stock, the total number of issued shares had increased to 43,896,098. Attached hereto, marked **Exhibit "14"** and incorporated by this reference is schedule reflecting the total number of shares issued by Plaintiff in all times periods relevant to this claim for relief, the time period of December 19, 2006 through July 27, 2007.

34.     Defendants materially breached the above quoted ownership restriction provision of the Convertible Debenture Agreement by acquiring and owning more than 4.99% of Plaintiff's issued stock.  As set forth in Exhibit "13", attached hereto, on July 13 and 19, 2007, the Transfer Agent issued share certificates with serial numbers totaling 3,272,000 registered, free-trading shares of Plaintiff's stock to Defendants. The 3,272,000 shares were delivered to Defendant's account on July 23, 2007, and thus on July 23, 2007, Defendants were the owners of  3,272,000 shares of Plaintiff's stock.  On said date, the total number of issued shares of Plaintiff's stock was 43,646,098. (See, Exhibit "14" attached hereto).  On such date, Plaintiff was therefore the owner of approximately 7.5% of the common stock and violated the ownership restriction limitation in the debenture agreement.

35.     In addition to the foregoing, at all relevant times mentioned herein, Defendants were in custody and control of an additional 8.4 Million shares of Plaintiff's common stock owned by the Radovich family, which had been transferred to Defendants' attorney, David Gonzalez, Esq. under the Pledge and Escrow Agreement, and Asset Pledge Agreement.  The Pledge and Escrow Agreement provides in relevant part, in Section 3, as follows: "Upon the occurrence of an Event of Default (as defined herein), the Collateral Agent [sic David Gonzalez, Esq., attorney for Defendants] shall be entitled to vote the Pledged Shares, receive dividends and other distributions thereon, and enjoy all other rights and privileges incident to the ownership".

36.     In July, 2007, Defendants served a two Notice of Default under the Debentures and other purchase documents to Plaintiff. As a result of serving the Notice of Default, the Defendants became entitled to the incidents of ownership of the 8,400,000 shares pledged by the Radovich family, which incidents of ownership, pursuant to Section 13(d) of the Exchange Act and the rules promulgated thereunder, made Defendants the beneficial owner of the pledged shares.  With the addition of the Pledged Shares beneficially owned after service of the Notice of Default, Defendants were owners of more than 4.99% of  the number of issued and outstanding shares of  Plaintiff's common stock from and after service of the Notice of Default.

37.     Plaintiff has performed all of the material conditions, covenants and promises required by it to be performed in accordance with the terms of its agreements with Defendants.

38.     As a direct result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined by the trier of fact.

**THIRD CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**Promulgated Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

39.     Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 38, inclusive, with the exception of paragraphs 22 and 31, set forth above.

40.      On December 20, 2006, Plaintiff and Defendants entered into a Securities Purchase Agreement for a structured PIPE transaction which resulted in Plaintiff issuing Secured Convertible Debenture(s) totaling $3.85 million and four classes of Warrants to Defendants, with related security, pledge and escrow documents listed in paragraph13 above and attached to this pleading, (collectively the "Purchase Agreement").

41.    Under the terms of the Purchase Agreement, the Defendants provided Plaintiff $3.435 million net in financing as consideration for Plaintiff's issuance of a $3.85 million Secured Convertible Debentures (collectively the "Debenture").  The Debenture granted Defendants the  right to convert all or any portion of the Debenture into Plaintiff's common stock at a price equal to 90% of the average of the lowest three daily volume weighted average trading prices per share of the Company's common stock for the fifteen trading days immediately preceding the conversion date (hereinafter, 'the volume weighted average price' will be referred to as the "VWAP")  Based on this formula, the lower Plaintiff's stock price during the fifteen-day period prior to Defendants' exercise of its conversion rights, the more shares the Defendants would receive on conversion. The Securities Purchase Agreement expressly prohibited the Defendants from selling short shares of Plaintiff's stock while the Debenture remained outstanding.  Plaintiff filed all of the Purchase Agreements and Debenture on its Form 8-K with the Securities and Exchange Commission in December, 2006.

42.  Between April 1 and November 30, 2007, the Defendants directed a series of short sales of Plaintiff's stock through various brokerage accounts held in the Defendants' name and through brokers trading as principals, at the direction of Defendants and controlled by Defendants, including but not limited to Sloan, Blue, Ridge and Knight.

42.  On at least three  occasions, (April 12, 13 and July 12, 2007), the Defendants sold Plaintiff's stock when it owned none of its shares, and on numerous occasions converted shares to cover short sales were not delivered by settlement day.  On such occasions, Defendants and their brokers failed to buy or borrow stock to cover these sales on the settlement date.

43.   The foregoing conduct was in violation of the Securities Purchase Agreement's prohibition against short selling and hedging operations.  In addition, Plaintiff is informed and believes based on the trading records of the OTCBB exchange, including price, volume, size of orders and market maker, that Defendants placed standing orders and  or made trading agreements with brokers, for the brokers to sell Plaintiff's stock in their proprietary accounts,

when the brokers did not possess shares of Plaintiff's stock that it was selling, based on

promises from Defendants to later cover these short sales with shares of stock converted from

debentures, with such brokers to received a certain guaranteed profit.

44.    On one such occasion, Defendant caused Plaintiff's stock to be issued directly to

the Ridge Clearing, to close out an open position at Ridge Clearing.  In particular, Defendants

requested the stock transfer agent on or about March 12, 2008 to convert debentures into

shares and issue the share certificate directly to Ridge, (not Cornell, the debenture holder), for

a block totaling 2,343,750 shares.

45.    Defendants' brokers continued to permit them to execute short sales, despite

repeated failure to deliver shares by settlement date.  Between the first week of April and first

week of October, 2007, Defendants converted debentures into stock, and sold said stock,

totaling in excess of 6,900,000 shares or 15% of the total issued and outstanding shares of

Plaintiff's common stock.  Defendants' heavy short selling and selling continued to put

downward pressure on Plaintiff's stock price.  The accumulated short open and undelivered

short position in Defendant's account at Sloan in Plaintiff's stock was 1,524,664 shares

between July 12 and 23, 2007.

46.    Defendants' short selling depressed Plaintiff's stock price during the fifteen day

trading periods prior to each conversion on which the VWAP of Plaintiff's stock was calculated

and thus reduced the credit or reduction on the balance owed on the Debenture.  Defendants

selling in the period of April to October, 2007 comprised a substantial percentage of the

trading volume in this period, estimated at 25% (since some trades are 'double prints', this

percentage is actually much higher).

47.    Based on the conversion formula in the Debenture, the lower the VWAP, the

more shares Defendants received from Plaintiff on conversion.  As a result of the sustained sell

pressure placed on Plaintiff's stock price, the VWAP for Defendants' conversions became lower

and lower, which increased the number of conversion shares that the Defendants received

from Plaintiff under the Debenture.  Defendants attempted to avoid  the prohibitions and

22

restrictions on shorting, hedging operations, and beneficial ownership by entering into trading

agreements with brokers, calling for brokers to sell Plaintiff's shares in their proprietary

accounts with the Defendants promising to close out short positions by causing share

certificates to be issued directly to the brokers.

48.   The heavy short selling by Defendants prior to August 1, 2007 was trading on

non-public inside material information in that Defendants' selling was in advance of its filing a

single creditor involuntary petition  on August 1, 2007 - - information to which it alone was

privy.  Defendants served a Notice of Default under the terms of the Debentures dated July 23,

2007 (first notice), and July 25, 2007 (second notice). Said notices were grounded exclusively in

allegations that Plaintiff breached a covenant against outstanding liens and judgments by

reason of  expiration of stay of judgment obtained by a creditor, Gryphon Master Fund, which

obligation was fully disclosed in Plaintiff's public filings prior to the PIPE transaction and was an

exception to the provision against liens and judgments because the Gryphon obligation, having

been fully disclosed, was deemed not be material to Defendants which proceeded with the

PIPE Transaction financing with knowledge of it and specifically directed Plaintiff not to pay the

Gryphon obligation.  In other words, the Defendants served a 'Notice of Default' under the

debenture agreement and commenced an involuntary bankruptcy based on an outstanding

obligation that had been fully disclosed before the convertible debenture financing, was

deemed not to be material, and thus Defendants were stopped from relying upon such

obligation to declare a default.  Consequently, Defendants' heavy selling and short sales in

advance of having served their Notice of Default and filing their involuntary petition

constituted trading on non-public information under their control.  Defendants sold first, and

then 'caused' the market price to drop after Defendants served a Notice of Default with an

open short position on July 12, 2007.

49.   Despite beneficial ownership of at least 5% of Plaintiff's issued stock from and

after July 23, 2007, the Defendants failed to report this ownership to position to the Securities

and Exchange Commission and violated the statutes, rules and regulations requiring public

disclosure of ownership positions in public companies in excess of 5% in a Form 13G filing. Plaintiffs continued to conceal their ownership position because they were actively shorting the stock through brokers acting as principals and did not want to draw the scrutiny of the Securities and Exchange Commission.

50.    Defendants profited from the foregoing scheme in at least three ways.  First, the short sales locked in a sale price for Plaintiff's stock that was higher than the conversion price for the shares ultimately used to cover the open short positions. Second, Defendant's short sales increased the supply of Plaintiff's shares in the market and depressed the price. As a result of the depressed market price, Defendants converted the Debenture into a greater number of shares of Plaintiff's stock, which were already discounted to the market, and which it then used to cover its previous short sales made at higher prices.  Third, by heavy selling and short selling in July, 2007, in advance of its involuntary petition filed against Plaintiff on August 1, 2007, an involuntary filing of dubious merit filed by Cornell as a single petition creditor, at a time when the Debenture was not due, and all interest payments were yet to be made, and based upon a judgment of which it had actual and constructive knowledge since prior to executing the PIPE transaction documents, and which was an exception to the no liens or judgment provision relied upon, was trading on non-public, material, inside information and permitted Defendants to receive a higher sale price for their shares than that which they would have received after their involuntary filing.

51.    Based on the foregoing, from at least March 2007 through October 2007, Defendants, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this pleading, have been, knowingly, willfully or recklessly: (a) employing devices, schemes or artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaging in acts,

practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

52.    By reason of the activities described in the paragraphs above, defendants directly or indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, thereunder.

53.    As a direct result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined by the trier of fact, but believed to be in excess of $100,000,000.

### FOURTH CLAIM FOR RELIEF

**Violations of Section 17(a)(1) of the Securities Act**

**[15 U.S.C. § 77q(a)]**

54.    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 53, inclusive, with the exception of paragraphs 22, 31, and 39, set forth above

55. Based on the foregoing, from at least March 2007 through October 2007, Defendants, directly and, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, have been, knowingly, willfully or recklessly employing devices, schemes or artifices to defraud.

56. By reason of the activities described in paragraphs 40 through 53, inclusive, above, Defendants directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

57.    As a direct result of Defendants' actions, Plaintiff has suffered damages in an amount to be determined at trial but believed to be in excess of $100,000,000.

### FIFTH CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1961(a) for R.I.C.O. Violations against all Defendants)**

58      Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 57, inclusive, with the exception of paragraphs 22, 31, 39 and 54, set forth above

59.      Defendants, and each of them, have participated, directly and indirectly, in a pattern of racketeering activity.  The pattern includes the following predicate acts (together with other predicate acts and unlawful schemes not yet known to Plaintiffs), each of which occurred within the last ten years.  In furtherance of that scheme, Defendants conspired to commit and did in fact commit acts of mail fraud and wire fraud as defined in 18 U.S.C. §§ 1341 and 1343; and financial institution fraud as defined in 18 U.S.C. § 1344.  The Defendants formed an association with each other and by doing so became and were enterprises whose activities affected interstate commerce, within the meaning of 18 U.S.C. § 1961(4).  These Defendants' acts of mail fraud, wire fraud, and financial institution fraud include but are not limited to:

a.  Making intentional, false representations to Plaintiff in connection with the PIPE Transaction documents filed with the Securities and Exchange Commission that Defendants would not short Plaintiff's stock, would not own more than 4.99% of Plaintiff's stock, and would acquire stock with an investment purpose and not with the purpose of immediately distributing and reselling the stock to the public;

b.  Making intentional, false representations, or concealing and omitting to state material facts and inside information to buyers of Plaintiff's stock in connection with sales of stock in July, 2007 at such time as Defendants knew they were going to serve a Notice of Default under the debenture agreements to Plaintiff and commence an involuntary bankruptcy case against;

c.   Having engaged in a pattern of such activity over the course of approximately ten years with dozens of other public companies in similar PIPE transactions resulting in death spiral stock prices for the borrower due to Defendants' violation of anti shorting provisions and manipulation of the markets for the borrower's stock based on inside, material information learned during 'due diligence' in the PIPE transaction;

d. Sending loan application materials and supporting documents to a federally insured lending institution' and the United States Government to obtain TALF and or TARP funds,  through the United States Mail, or via facsimile;

e. In connection with each of the above predicate acts of racketeering activities Defendants also engaged in fraudulent use of the wires to negotiate agreements, and transmit false information.

60.   Plaintiff is informed and believes and based thereon alleges that Defendants and each of them, on numerous occasions used the wire, namely telephone and fax transmissions, to perpetrate their fraudulent scheme, and to further give instructions to carry out their scheme to others acting in concert with them to defraud Plaintiff and other public companies and profit from illegal short sales and sales to the public based on inside, material information.

61.   As a direct result of Defendants' fraudulent scheme, Plaintiff has suffered damages as a result of its artificially depressed stock price, which has prevented it from raising capital to pay expenses and obligations, including the debentures held by Defendants, by staying in bankruptcy for a protracted period of time due to an improper Chapter 7 involuntary commenced by Defendants in furtherance of their scheme and loss of many business opportunities due to the injuries and loss to Plaintiff's reputation and credit.

62.   As a result of Defendants' violation of 18 U.S.C. § 1962(a), by Defendants and each of them, and by reason thereof, Plaintiffs were injured in their business and property, all to their economic loss and damage in the amount of approximately $100,000,000 dollars,

according to proof.   Plaintiffs are further entitled to recover threefold damages sustained, including reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF

**(Unjust Enrichment & Restitution)**

63.    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 62, inclusive, with the exception of paragraphs 22, 31, 39, 54, and 58, set forth above.

64.    Defendants sent to Plaintiff   notices of putative acts of default under the terms of the Debentures.  The first notice of default was dated July 23, 2007, and a second notice of default was dated and served on July 25, 2007.  The first notice  mistakenly asserted that Cobalis was in default because of its bankruptcy filing.  Cobalis had not filed for bankruptcy and therefore the notice was a nullity.  The second notice was grounded exclusively in allegations that Cobalis had putatively defaulted under the terms of its Debentures by reason of the acts of Gryphon to levy upon assets of Cobalis.  Based solely upon its Texas judgment, subsequently registered in California, and without the knowledge or consent of Cobalis, Gryphon registered its judgment, which had been previously been entered on the docket of the district court, with the Secretary of State of California in or about May  of 2007 against the personalty of Cobalis in California.  Gryphon then went the extra step of obtaining an ORAP Order from the district court and serving same upon Cobalis.  This created a statutory lien that is unavoidable in bankruptcy regardless of the preference period and the solvency of the Debtor.  The notices issued and  Defendants' act of filing an Involuntary Chapter 7  were  acts of bad faith since:

      a.    Defendants knew about Gryphon's April 3, 2006, judgment when it entered into the Transaction Documents on December 20, 2006. In the PIPE Transaction documents, Defendants admitted and acknowledged receipt and awareness of all material matters affecting Plaintiff's finances and matters

28

disclosed by Plaintiff in public filings with the Securities and Exchange
Commission, in which filings the Gryphon judgment had been fully disclosed,
(Ex. "1", Securities Purchase Agreement, Section 2(d) and (i).   In fact, in the
Securities Purchase Agreement, ¶4. (p) YAGI explicitly forbade Cobalis from
using any of the funds that Defendants paid for the Debentures to pay the
Gryphon judgment, "directly or indirectly".  Thus, in proceeding with the PIPE
Financing with knowledge of the Gryphon judgment or requiring as a condition
precedent that it be paid, Defendants deemed it not to be a material factor to
their position as a creditor based on its assessment that they would be obtaining
a fully secured, perfected, first lien position on substantially all assets of
Plaintiff;

b.     Cobalis did nothing subsequently that in any way could be
construed as affecting  Defendants' putative UCC-1 filing to the detriment of
Defendants; and

c.     Cobalis gave prompt notice to  Defendants of said acts of
Gryphon to levy upon assets covered under the Transaction Documents.

d.     Cobalis was in no way responsible for the inability of Defendants
to adduce any probative proof of any UCC-1 financing statement filing in any
state. This was the sole reason why the federal court ruled that Gryphon's
judicial and statutory liens against Cobalis were superior to  Defendants.
Defendants and or their  attorneys committed  acts of gross negligence in failing
to perfect Defendants' security agreement on the assets of Plaintiff in breach of
the PIPE Transaction documents, which permitted Gryphon, not Defendants, to
obtain a first lien position, and such failure to timely perfect Defendants' lien
was the sole source of harm to Defendants, and not the Gryphon judgment
which preceded the PIPE Transaction documents, and which could not be
enforced as a result of stay which preceded the PIPE Transaction;

e.    To rectify the harm caused by Defendants and or their counsels' gross negligence in failing to perfect their security interest, Defendants served the errant notices of default based on a judgment which was fully disclosed before the PIPE transaction documents were executed and which had been deemed non material because Defendants believed they would be secured by a first position lien. Defendants then wrongfully claimed in the bankruptcy case to be a first position secured creditor when its security interest was never been perfected

65.    Based on the foregoing, Defendants were, and are, estopped from declaring a breach of the Debentures based solely upon the judgment obtained by Gryphon Master Fund  I in the State of Texas, and that  the notices  of default served by Defendants,  and their act of filing an Involuntary Chapter 7 petition against Plaintiff on August 1, 2007 were  all acts of bad faith. Consequently Defendants' Proofs of Claims  have all been grossly inflated by attorneys fees that are not attributable to Plaintiff, which was never in <u>material</u> default.

66.    Defendants were unjustly enriched by the award of attorneys' fees in the bankruptcy case, save and except fees 'stipulated to' by Plaintiff in the plan or reorganization and seek recovery and reimbursement for all other attorneys fees paid to Defendants in the case.

### <u>SEVENTH CLAIM FOR RELIEF</u>

### (Declaratory Relief & Injunctive Relief)

67.    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 66, inclusive, with the exception of paragraphs 22, 31, 39, 54, 58, and 63, set forth above.

68.     Controversies have arisen concerning the meaning and interpretation of the Securities Purchase Agreement and related PIPE Transaction documents. In particular, disputes have arisen concerning, inter alia, the meaning of the terms "short sales" and "hedging operations", whether the Gryphon judgment was disclosed, deemed immaterial and an exception to contractual provision against liens and judgments such that Defendants were estopped from relying upon the outstanding Gryphon obligation to declare a default,  the effect of service of a Notice of Default on beneficial ownership of pledged stock and the 4.99% ownership restriction, defendants' alleged right to attorneys fees in the bankruptcy case having commenced the involuntary bankruptcy solely on account of the fact that Defendants had failed to perfect  its security interest and wanted to block another creditor from obtaining a first position lien, the amount of gains on short sales, the amount of losses avoided by Defendants in connection with short sales,  and profiting from sales trading on non-public material information; finally whether credit is due to Plaintiff on the debentures based on conversion prices of common stock that were artificially depressed by Defendants' unfair and deceptive trading and manipulation of stock sales with brokers.

69.     Plaintiff desires a judicial determination of the rights, duties and obligations of the parties under the PIPE transaction documents following the Court's interpretation and construction of the foregoing terms or provision in the PIPE transaction documents in dispute. Plaintiff further requests that such decree apply New Jersey law pursuant to the choice of law provisions in the Transaction Documents.

70.     A declaration is necessary and appropriate in order to avoid a multiplicity of actions.

71.     Plaintiffs pray for a preliminary injunction and permanent injunction enjoining and prohibiting Defendants from continuing breaches of the PIPE Transaction documents, and from claiming or receiving awards of attorneys fees during the pendency of this case from the reorganized debtor.

**EIGHTH CLAIM FOR RELIEF**

**(Unfair Business Practices  - Common Law)**

72.    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 71, inclusive, with the exception of paragraphs 22, 31, 39, 54, 58, 63, and 67, set forth above.

73.    Defendants intentionally engaged in deceptive and unfair business practices. Defendants represented to Plaintiff  in writing, and supplemented by oral conversations with Defendant's officers prior to the PIPE Transaction that it would never engage in short sales, hedging operations, acquire own more than 4.99% of Plaintiff's stock, sell more shares in a day, week, or month more than 10-20% of the average trading volume for such periods of time, and that its intention in converting debentures into stock and exercising warrants was to be an shareholder looking toward  future growth Plaintiff's company in harmony with Plaintiff's business purpose of developing  markets for its product.

74.    Defendants further engaged in deceptive and unfair business practices by serving an invalid notices of default on Plaintiff in July, 2007, when Defendant was current in its debenture payments, and also in August, 2007, by commencing an involuntary bankruptcy proceeding against Plaintiff, for the sole reason that Defendants, and Defendants' attorneys, had failed to perfect a security interest in Plaintiff's assets due to their own negligence, and without any wrong doing or fault on the part of Plaintiff.  Defendant filed the involuntary bankruptcy proceeding against Plaintiff because it wanted to obstruct and block another creditor from obtaining a superior lien position in Plaintiff's assets ahead of Defendants, and not for the stated reason that Plaintiff had failed to pay an obligation to Gryphon, which obligation had been disclosed in public filings before the PIPE Transaction and Defendants were made fully aware of the Gryphon obligation, which was specifically mentioned in the PIPE Transaction documentation.    Therefore, had Defendants actually considered Plaintiff's outstanding  obligation to Gryphon to be a material factor in Defendants' decision to extend

financing in the PIPE, Defendants could and would have made payment of the Gryphon

obligation a condition precedent.   Instead, Defendants directed Plaintiff not to pay the

Gryphon obligation because Defendants believed that they would obtain a superior lien

position ahead of Gryphon which lien would fully protect Defendants and Plaintiff from the

consequences of any collection effort by Gryphon.

75.    Defendants knew that its promises and representations concerning its business

practices in connection with convertible debentures and warrants obtained in PIPE

transactions were false when made, inasmuch as Plaintiff discovered to its chagrin <u>after the</u>

<u>PIPE Transaction</u>, that  YAGI, CORNELL, and YA had entered into approximately $762 million in

PIPE deals since 2001, causing the underlying stocks to drop 38% on average in the first year.

The PIPE transactions entered into by YAGI can be fairly described as "designed to fail," as 75%

or more of the 350-plus PIPE transactions entered into by YAGI between 2001 and 2008 were

with public companies that are no longer in business.  These transactions, unknown at their

inception to the publicly traded companies, were *designed to precipitate failure of the business*

*entity with Defendants receiving payment, not in the form of cash payments on debt financing*

*but through concentrated, market disrupting sales of stock converted from debentures, resort*

*to the borrower's collateral, hedging operations and short trading, all of which practices have*

*brought scrutiny to PIPE transactions by the United States Securities and Exchange Commission.*

76.    Defendants engaged in deceptive and unfair business practices and broke its

promises and breached its agreements by converting debentures and promptly selling large

quantities of Plaintiff's stock, greatly in excess of average trading volumes, short selling,

hedging operations, accumulating ownership of more than 5% of Plaintiff's stock, and

manipulating the issuance of shares under the Pledge and Escrow Agreement and Irrevocable

Instruction to Stock Transfer Agent so as to delay delivery of share certificates and create

downward pressure on Plaintiff's stock which had been pre-sold by Defendants, serving invalid

notices of default and filing an involuntary petition for bankruptcy  against Plaintiff based on a

33

debt owed to Gryphon which the Defendants were stopped from declaring a material breach of the debenture agreement.

77.    As a proximate cause of Defendants' unfair business practices, Plaintiff has suffered damages in an amount to be determined by the trier of fact.

**NINTH CLAIM FOR RELIEF**

**(Intentional Interference with Prospective Economic Advantage)**

78.    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 77, inclusive, with the exception of paragraphs 22, 31, 39, 54, 58, 63, 67, and 72, set forth above.

**A.     The Novak and Family Sport Relationship**

79.    Plaintiff was involved in a valid and existing business relationship with Goran Djokovich, of Novak and Family Sport.  Plaintiff had fully negotiated the terms of the contract, however, such contract was not consummated and the relationship was disrupted by Defendants,  through the wrongful filing of an involuntary petition against Plaintiff for bankruptcy.  When Djokovich and Novak and Family Sport  learned of  the involuntary petition for bankruptcy filed against Plaintiff, they declined to move forward with the contract because of a stated belief that Plaintiff was financially unstable and therefore not a proper business partner for them.  The terms of the five year contract which had been negotiated called for the purchase of 400,000 units per year, or 2,000,000 units over the contract term.

80.    Defendants' interference with the business relationship between Plaintiff and Djokovich and Novak and Family Sport  resulted in damage to Plaintiff in the amount of the net present value of  the net profit on the contract, in the approximate amount of $10,000,000, subject to proof at the time of trial.

**B.     Zoran Pavlovic of Galenka Goranda**

81.    Plaintiff was involved in a valid and existing business relationship with Zoran Pavlovic of Galenka Goranda.  Plaintiff had fully negotiated the terms of a distributorship agreement for Southern Europe with purchase requirements  averaging 800,000 units per year over a five year term; however, such contract was not consummated and the relationship was disrupted by Defendants,  through the wrongful filing of an involuntary petition against Plaintiff for bankruptcy.  When Zoran Pavlovic of Galenka Goranda  learned of  the involuntary petition for bankruptcy filed against Plaintiff, they declined to move forward with the contract because of a belief that Plaintiff was financially unstable and at risk of being sold or taken over by another party.

82.    Defendants' interference with the business relationship between Plaintiff and Zoran Pavlovic of Galenka Goranda resulted in damage to Plaintiff in the amount of the net present value of  the net profit on revenues of $20,000,000 over the five year contract, subject to proof at the time of trial.

### C.    Herbalife

83.    Plaintiff was involved in a valid and existing business relationship with Herbalife  and its prime business source, Brian Stricel of BJS Consulting, located in Francis, Utah.  Plaintiff was negotiating the terms of a Plaintiff its relationship with Herbalife, through its Herbalife was set to sign an exclusive distributorship with the company for all multilevel marketing in the United States and Worldwide.  The agreement was not consummated and the relationship was disrupted by Defendants,  through the wrongful filing of an involuntary petition against Plaintiff for bankruptcy.  When Brian Stricel and Herbalife learned of  the involuntary petition for bankruptcy filed against Plaintiff, they declined to move forward with the contract because of a belief that Plaintiff was financially unstable.

84.    Defendants' interference with the business relationship between Plaintiff and Herbalife and BJS Consulting resulted in damage to Plaintiff in the approximate amount of loss $15,000,000, representing the gross profit on a bare minimum sale of one unit apiece by each of  Herbalife's 3,000,000 established distributors.

1        **D.      Foreign Territories**

2        85.      Plaintiff's prospects for a contract with a business group from Azerbejan Baku,

3    which specialized in the distribution of medical products in Eastern Europe and the past Soviet

4    satellites, and which  was negotiating to become the distributor for  that region, as well as

5    group in the People's Republic of China for an exclusive distributorship of the product in that

6    regions, were disrupted by the bankruptcy filing of Defendants.

7        86.      Defendants' interference with the foregoing business relationships resulted in

8    damage to Plaintiff in the approximate amount of loss  $10,000,000, representing the gross

9    profit on  sales to the distributors covering these enormous market opportunities

10

11                                    **JURY TRIAL DEMAND**

12        Plaintiff hereby reserves its right to a trial by jury on damages as to claims  based on law

13    and not in equity. [Plaintiff requests and consents to management, control, and trial of all

14    other issues by the Bankruptcy Court].

15

16        WHEREFORE, Plaintiff prays for judgment, as follows:

17

18        1.      For general and compensatory damages in a sum to be determined by the trier

19    of fact;

20        2.      For treble damages (on the R.I.C.O. claim);

21        3.      Rescission;

22        4.      Restitution or disgorgement;

23        5.      For punitive damages in a sum to be determined by the trier of fact;

24        6.      For a decree consistent with Plaintiff's allegations in  paragraph _ of this

25    pleading.

26        7.      For a temporary restraining order, preliminary injunction and permanent

27    injunction enjoining Defendants, and each of them, and their agents, employees and assigns

28

1  from short sales and sales in violations of the federal securities laws in connection with

2  Plaintiff' stock;

3        8.      For reasonable attorneys fees;

4        9.      For costs of suit herein incurred;

5        10.     For such other and further relief as the court may deem proper.

6

7  DATED this 7th day of January, 2011.

8                                                              LAW OFFICE OF HOWARD NEMIROF

9
                                                              /s/  Howard Nimerof, Esq.          /
10                                                            Attorney for Plaintiff,  Cobalis Corp.

11

12                                                            LAW OFFICE OF GREGORY GRANTHAM

13
                                                              /s/  Gregory Grantham, Esq.        /
14                                                            Attorney for Plaintiff, Cobalis Corp.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE OF DOCUMENTS

2

        I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.

3

My business address is 610 Newport Center Drive, Suite 600, Newport Beach, California
92660.   A true and correct copy of the foregoing document(s) described as:

4

### THIRD AMENDED COMPLAINT

5

will be served or was served (a) on the Judge in chambers in the form and manner required by

6

LBR 5005-2(d); and (b) in the manner indicated below:

7

**I.      SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

8

        Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing

9

document was served on the following person(s) by the court via NEF and hyperlink to the
document. As of January 7, 2011,  the following person(s) are currently on the Electronic

10

Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF
transmission at the email address(es) indicated below.

11

12

Keith C. Owens                                    **United States Trustee (SA)**
Foley & Lardner LLP                             411 W Fourth St., Suite 9041

13

555 South Flower Street, 35th Floor         Santa Ana, CA 92701-4593
Los Angeles, CA  90071-2411               ustpregion16.sa.ecf@usdoj.gov

14

kowens@foley.com

15

**Robert P Goe**

16

Goe & Forsythe, LLP
18101 Von Karman, Ste 510

17

Irvine, CA 92612
kmurphy@goeforlaw.com

18

19

**II.      SERVED BY U.S. MAIL AND/OR OVERNIGHT MAIL:**

20

        On January 7, 2011, I served the following persons and/or entities by U.S. Mail at the last

21

known addresses in this bankruptcy case or adversary proceeding. I also served the
following persons and/or entities by placing a true and correct copy thereof in a sealed

22

envelope in the United States Mail, first class, postage prepaid, and/or with an overnight
mail service addressed as follows. Listing the Judge here constitutes a declaration that

23

personal delivery on the Judge will be completed no later than 24 hours after documentation

24

is filed.

25

**Via U.S. Mail**

Debtor Cobalis Corporation

26

Attn: Chaslav Radovich, President
2030 Main Street, Suite 1300

27

Irvine, CA  92614

28

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL**:

Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 7, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**Via Personal Delivery to Chambers**
The Honorable Theodor C. Albert
U.S. Bankruptcy Court – Santa Ana
411 West Fourth Street,
Santa Ana, CA  92701

**Via Email**
C. Luckey McDowell
Baker Botts LLP
2001 Ross Avenue
Dallas, TX  75201-2980
Email: luckey.mcdowell@bakerbotts.com

**Via Email**
Richard B. Harper
Kristin E. Flood
Baker Botts LLP
30 Rockefeller Plaza, 44th Floor
New York, NY  10112
Email: richard.harper@bakerbotts.com

**Via Email**
David Filler / John Kelso
Levey, Filler, Rodriguez, Kelso & DeBianchi
1688 Meridian Ave., Ste. 902
Miami Beach, FL  33139
Email: dfiller@leveyfiller.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 01/07/11 | Gregory Grantham | /s/ Gregory Grantham |
|----------|------------------|----------------------|
| Date     | Type Name        | Signature            |